IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CONNIE D. PARKER,                          *

     Plaintiff,                          *

v.                                         *          Civil Action No. GLR-25-2398

PULTEGROUP, INC., et al.,                  *

     Defendants.                         *

*** 

<u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Defendants Pulte Home Company, LLC ("Pulte Home"), Pulte Mortgage, LLC, and PulteGroup, Inc.'s (collectively, "Pulte") Motion to Stay and Compel Arbitration, (ECF No. 10), and Defendant Benjamin Pooler's Motion to Dismiss or, in the Alternative, to Stay and Compel Arbitration, (ECF No. 11). The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will grant the Motions.

## I.    BACKGROUND[1]

On April 19, 2022, self-represented Plaintiff Connie D. Parker, a seventy-four-year-old United States Army veteran, visited Pulte Home's sales office in Laurel, Maryland, to view model townhomes in the Watershed community. (Compl. ¶¶ 11, 13, ECF No. 7). Pooler, a Pulte Home employee, (Nicholas Decl. at 2, ECF No. 11-2),[2] assisted Parker in

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 7) and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

[2] Unless otherwise noted, citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Files ("CM/ECF") system.

viewing one of the larger townhomes with a starting price of $454,990 and an increased price of $475,445, after accounting for optional upgrades, (Compl. ¶ 13). Parker decided to purchase the new-build townhome and, based on Pooler's indication of when Pulte Home would finish construction, notified her landlord that she would vacate her apartment in September 2022. (Id. ¶ 18).

Pooler informed Parker that Pulte Home offered a $10,000 closing cost incentive if she obtained her mortgage loan through PulteGroup's affiliate, Pulte Mortgage. (Id. ¶ 14; see also Home Purchase Agreement ["HPA"] at 16, ECF No. 10-2). Considering this $10,000 incentive and the $2,000 credit that Parker expected to receive as a first-time homebuyer in Maryland, she opted to use Pulte Mortgage. (Compl. ¶¶ 14–15, 19; HPA at 16).

Pooler also informed Parker that Pulte Home required a $20,000 "good faith down payment." (Compl. ¶ 15; HPA at 3). Based on Parker's understanding, she did not have to pay a down payment due to her veteran status. (Compl. ¶ 15). Even so, she agreed to the $20,000 down payment, believing that the net $8,000 she would pay after accounting for the $10,000 incentive and $2,000 credit was reasonable. (Id.).

On April 21, 2022, Parker signed a Home Purchasing Agreement ("HPA"), (HPA at 13), in which Pulte Home agreed to build, and Parker agreed to purchase, a townhome in the Watershed community, (id. at 3). The HPA memorializes Parker's agreement to provide a $20,000 down payment, (id.), which she paid on April 22, 2022, (Compl. ¶ 16). The HPA also contains Parker's selections of Pulte Mortgage as her lender and a United States Department of Veteran Affairs ("VA") loan as the type of mortgage loan she would

obtain. (HPA at 16, 18). Among the HPA's other provisions is an arbitration clause that states the following:

> This Agreement provides that all Disputes (defined below) between [Pulte Home] and [Parker] will be resolved by BINDING ARBITRATION. This means both [Pulte Home] and [Parker] GIVE UP THE RIGHT TO GO TO COURT OR TO A JURY to assert or defend rights under this Agreement (EXCEPT for matters that may be taken to SMALL CLAIMS COURT as provided below). [Pulte Home]'s and [Parker]'s rights will be determined by a NEUTRAL ARBITRATOR and NOT by a judge or jury. . . .

> **12.1 <u>Agreement to Arbitrate Disputes</u>.** . . . [I]f [Pulte Home] and [Parker] are unable to resolve a dispute relating to this Agreement or the Property, the parties believe it is best to have a fair and efficient way to resolve that dispute. Accordingly, [Parker] and [Pulte Home] agree that any controversy, claim or dispute that arises out of or is related to this Agreement or the Property (including without limitation any claims for breach of contract, . . . misrepresentation and fraud), whether arising before or after Closing (collectively, "Disputes"), shall be resolved through binding arbitration. . . .

> **12.2 <u>Applicable Law</u>.** . . . The Federal Arbitration Act (the "FAA") shall govern the interpretation and enforcement of this provision. . . .

> **12.4 <u>Arbitration Rules</u>.** The arbitration shall proceed in accordance with the [American Arbitration Association's ("AAA")] rules applicable to the Dispute. . . .

> **12.5 <u>Additional Parties or Claims</u>.** Any Dispute involving claims against [Pulte Home]'s parent, subsidiaries, successor entities, future acquired entities or affiliated companies or any of their respective . . . employees . . . also shall be resolved through binding arbitration as set forth herein. [Parker] and [Pulte Home] agree that this arbitration agreement inures to the benefit of those parties. . . .

> **12.7 <u>Expenses</u>.** . . . [I]f a party to this Agreement files a court action in violation of this Section 12 and the other party is

> required to compel arbitration by filing a motion with the court,
> the court shall award the moving party its court costs and
> reasonable attorneys' fees incurred in connection with the
> motion.

(HPA at 10–11). The HPA also contains a severability clause:

> **1[3].10: <u>Invalid Provisions</u>.** If any of this Agreement is held
> to be illegal, invalid or unenforceable under present or future
> laws, such provision shall be fully severable, and the remainder
> of this Agreement shall remain in full force and effect and shall
> be construed and enforced as if such illegal, invalid or
> unenforceable provision had never been a part of this
> Agreement. . . .

(<u>Id.</u> at 11).

Parker alleges that, during the mortgage approval process, Pulte Mortgage claimed
falsely that she was eligible for a VA loan of only $431,000 when, according to Parker, she
was eligible for a VA loan of $718,000 "due to the cost of living in the Laurel, Maryland
area." (Compl. ¶ 22). Parker further alleges that five days before closing, Pulte Mortgage
"demanded an additional $50,000 from" her. (<u>Id.</u> ¶ 24). Parker avers that Pulte Mortgage
presented her with the lower VA loan eligibility amount to "forc[e] her to pay a larger
down payment" at the last minute. (<u>Id.</u> ¶ 23).

Based on her own investigation, Parker also alleges that Pulte engaged in unlawful
discrimination by selling larger houses to white individuals for lower prices and lower
down payments. (<u>Id.</u> ¶ 29). Parker alleges that Pulte discriminated against her on the basis
of age and race because many of her neighbors in the Watershed community paid less than
she did for their larger homes. (<u>Id.</u> ¶¶ 32–33).

4

Parker filed a Complaint in the Circuit Court for Anne Arundel County on June 6, 2025, against Pulte, Pooler, and ten unnamed defendants. (Id. at 2). She alleges violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. § 13-301, (Count I); intentional misrepresentation (Count II); constructive fraud (Count III); violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq. (Count IV); violations of the Civil Rights Act ("CRA"), 42 U.S.C. § 1981, et seq. (Count V); and intentional infliction of emotional distress (Count VI). (Id. ¶¶ 37–105). Pulte and Pooler removed the case to this Court on July 23, 2025. (ECF No. 1). On July 30, 2025, Pulte filed a Motion to Stay and Compel Arbitration, (ECF No. 10), and Pooler filed a Motion to Dismiss or, in the Alternative, to Stay and Compel Arbitration, (ECF No 11). Parker filed Oppositions to both on August 24, 2025. (ECF Nos. 17, 18). Pulte and Pooler filed Replies on September 8, 2025. (ECF Nos. 19, 20).

## II.    DISCUSSION

### A.    <u>Choice of Law</u>

As a threshold matter, the Court finds that Maryland law governs this contractual dispute because (1) the parties executed the HPA in Maryland, (see HPA at 20 (Maryland state addendum)); Cunningham v. Feinberg, 107 A.3d 1194, 1204 (Md. 2015) (In Maryland, "when determining the construction, validity, enforceability, or interpretation of a contract, [courts] apply the law of the jurisdiction where the contract was made."); CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009) (Federal courts "apply the choice of law rules of the forum state."); and (2) the HPA contains a choice of law provision that designates the law of the state in which the subject

property is located as the governing law in any arbitration or litigation arising out of the HPA, (HPA at 12); Cunningham, 441 Md. at 1204 ("If the contract contains a choice of law provision, [Maryland courts] apply generally the law of the specified jurisdiction.").

In Maryland, courts follow "the law of objective contract interpretation," meaning the written language of a contract "govern[s] the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is" ambiguous or unclear. Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co., 73 A.3d 224, 232 (Md. 2013) (quoting Slice v. Carozza Properties, Inc., 137 A.2d 687, 693 (Md. 1958)). Thus, "a contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution." Id. A court must seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." Id.

When interpreting contract language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." Sy-Lene of Wash., Inc. v. Starwood Urb. Retail II, LLC, 829 A.2d 540, 546 (Md. 2003). The court must construe the contract "in its entirety" and must give each clause effect such that the court "will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." Dumbarton, 73 A.3d at 232–33 (quoting Sagner v. Glenangus Farms, Inc., 198 A.2d 277, 283 (Md. 1964)).

**B.**     **Standard of Review**

"[M]otions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." PC Constr. Co. v. City of Salisbury, 871 F.Supp.2d 475, 477 (D.Md. 2012) (quoting Shaffer v. ACS Gov't Servs., Inc., 321 F.Supp.2d 682, 683 (D.Md. 2004)). Courts treat a motion to compel arbitration as a motion for summary judgment when "the formation or validity of the arbitration agreement is in dispute," Caire v. Conifer Value Based Care, LLC, 982 F.Supp.2d 582, 589 (D.Md. 2013), or when the court must consider documents outside the pleadings "to effectively assess the merits of [the] motion," Shaffer, 321 F.Supp.2d at 683–84; accord PC Constr. Co., 871 F.Supp.2d at 477 ("Whether the motion [to compel arbitration] should be treated as a motion to dismiss or a motion for summary judgment turns on whether the court must consider documents outside the pleadings."); see also Galloway v. Santander Consumer USA, Inc., 819 F.3d 79, 85 n.3 (4th Cir. 2016) (stating that under the Federal Arbitration Act, a party seeking a jury trial "must show genuine issues of material fact regarding the existence of an agreement to arbitrate," a standard that is "akin to the burden on summary judgment" (quoting Chorley Enters. v. Dickey's Barbecue Rests., 807 F.3d 553, 564 (4th Cir. 2015))). Here, the Court will apply the summary judgment standard because Parker disputes the validity of the arbitration agreement, (see Pl.'s Opp'n Pulte's Mot. ["Opp'n Pulte Mot."] at 9–11, ECF No. 17),[3] and because resolving this dispute requires consideration of materials beyond the pleadings, (see generally Nicholas Decl.; HPA).

---

[3] Because Parker's Opposition to Pooler's Motion merely repeats the arguments regarding the arbitration agreement in her Opposition to Pulte's Motion, (see Opp'n Pulte

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). A party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir.

---

Mot. at 5–11; Pl.'s Opp'n Pooler's Mot. at 7–9, ECF No. 18), the Court will cite only to Parker's Opposition to Pulte's Motion when discussing her arguments.

2001)). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986) (quoting <u>Anderson</u>, 477 U.S. at 250).

## C.    <u>Analysis</u>

Pulte and Pooler have moved to compel arbitration under the HPA's arbitration clause. (Mem. L. Supp. Mot. Compel & Stay Arbitration ["Pulte Mot."] at 1, ECF No. 10-1; Mem. L. Supp. Mot. Dismiss, Stay & Compel Arbitration ["Pooler Mot."] at 4, ECF No. 11-1).[4] To prevail on a motion to compel arbitration, a party must show the existence of

---

[4] Pooler moves first to dismiss for Parker's failure to serve him properly. (Pooler Mot. at 2–4). Because the Court finds that Parker's dispute is subject to a binding and enforceable arbitration clause, as explained in Section II.C. of this Memorandum Opinion, Pulte's and Pooler's Motions to Compel Arbitration will be granted. Accordingly, the Court does not reach Pooler's argument that the Complaint should be dismissed. <u>See</u> <u>Adkins v. Lab. Ready, Inc.</u>, 303 F.3d 496, 500 (4th Cir. 2002) (noting "Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation," and that "[a] district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview").

(1) a dispute between the parties; (2) a written arbitration provision that purports to cover the dispute; (3) a relationship between the transaction and interstate or foreign commerce; and (4) the failure of a party to arbitrate the dispute. Adkins v. Lab. Ready, Inc., 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991)).

Here, it is clear from the pleadings that a dispute exists between the parties and that Parker has opted to file suit rather than participate in arbitration. (See generally Compl.; Pulte Mot.; Pooler Mot.; Opp'n Pulte Mot.). Additionally, Parker does not dispute that the transaction between her and Pulte "involved interstate commerce" because the materials used to build Parker's new townhome were manufactured in other states and "interstate commerce was used to purchase and transport" those materials. (HPA at 10; Pulte Mot. at 10; see generally Opp'n Pulte Mot.). The dispute, therefore, lies in whether there is "a written arbitration provision that purports to cover the dispute." Adkins, 303 F.3d at 500– 01. Pulte and Pooler argue that the HPA's arbitration clause requires Parker to arbitrate her claims. (Pulte Mot. at 9–10; Pooler Mot. at 4–5). Parker contends that the HPA's arbitration clause is unenforceable and that it does not cover her claims. (Opp'n Pulte Mot. at 5–11). This Court finds that the arbitration clause is enforceable and applicable.

### 1.    Enforceability of Arbitration Clause

Parker challenges the enforceability of the arbitration clause, arguing that (1) she "did not receive consideration for agreeing to arbitration," (Opp'n Pulte Mot. at 10–11); (2) the prohibitive costs of arbitration would preclude her from vindicating her rights effectively, (id. at 8); and (3) the arbitration clause does not allow her to seek the statutory

relief she would be entitled to if she prevailed in court, (id. at 6). Pulte and Pooler contend that the "mutual nature of the Arbitration Agreement" serves as sufficient consideration and that Parker's claims can be resolved through arbitration without infringing her statutory rights. (Reply Supp. Pulte Def.'s Mot. Stay & Compel Arbitration ["Pulte Reply"] at 7–12, ECF No. 19; Reply Supp. Def. Pooler's Mot. Dismiss, Stay & Compel Arbitration ["Pooler Reply"] at 3, ECF No. 20). The Court finds that the arbitration clause is supported by consideration and that, upon severing the unenforceable attorneys' fees language, the arbitration clause does not preclude Parker from vindicating her statutory rights effectively.

### a.    Consideration

The Federal Arbitration Act ("FAA") 9 U.S.C. § 1 et seq., "reflects 'a liberal federal policy favoring arbitration agreements.'" Adkins, 303 F.3d at 500 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, (1983)). It provides that arbitration clauses are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. Thus, courts must enforce valid, written arbitration agreements when a party seeks such relief. 9 U.S.C. § 3.

To be valid and enforceable under Maryland law, an arbitration agreement must be a binding contract supported by consideration. Cheek v. United Healthcare of the Mid-Atlantic, Inc., 835 A.2d 656, 661 (Md. 2003) (citations omitted). An arbitration clause under Maryland law is "an independently enforceable contract" that is "a severable part of the contract." Cheek, 835 A.2d at 664–65. Accordingly, a court may not rely on consideration underlying the overall contract but instead must find specific consideration for the arbitration agreement itself. Id. at 667; Hill v. Peoplesoft USA, Inc., 412 F.3d 540,

543 (4th Cir. 2005) ("[W]e examine only the language of the arbitration agreement itself" to determine whether it is a valid contract.).

Consideration must be in the form of a "binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." Cheek, 835 A.2d at 661. An illusory promise, unlike a binding obligation, "appears to be a promise, but it does not actually bind or obligate the promisor to anything." Id. at 662. Such a promise is not binding on the promisor and, therefore, cannot provide sufficient consideration to support an enforceable contract. Id. An arbitration agreement that "unambiguously binds both [parties] to arbitrate" any claims that arise out of the contract serves as sufficient consideration. Hill, 412 F.3d at 544. An arbitration agreement in which one party "reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy . . . at any time or without notice," on the other hand, "creates no real promise, and therefore, [is] insufficient consideration to support an enforceable agreement to arbitrate." Cheek, 378 Md. at 662.

Here, looking at the arbitration provision of the HPA alone, neither party has the right to modify the scope of arbitration or arbitration procedures, and there is no illusory promise—both parties are required to arbitrate. (See HPA at 10–11); see also Hill, 412 F.3d at 544 (finding adequate consideration where arbitration clause "unambiguously require[d] both [parties] to arbitrate"). The Court, therefore, finds that there is adequate consideration.

b.    Costs of Arbitration

According to the Supreme Court of the United States, "federal statutory claims can be appropriately resolved through arbitration" only if "the prospective litigant effectively

12

may vindicate [his or her] statutory cause of action in the arbitral forum . . . ." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 89–90 (2000) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991)). Consequently, an arbitration agreement may be unenforceable if its terms require an aggrieved party to pay costs and fees "that are so prohibitive as to effectively deny the [party] access to the arbitral form." Muriithi v. Shuttle Exp., Inc., 712 F.3d 173, 181 (4th Cir. 2013) (quoting Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 554 (4th Cir. 2001)). "[T]he party seeking to invalidate an arbitration agreement on this basis bears the 'substantial' burden of showing a likelihood of incurring prohibitive arbitration costs." Id. (quoting In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 286–87 (4th Cir. 2007)).

Here, Parker has provided no information regarding the costs of arbitration, her ability to pay such costs, or the difference between the cost of arbitration and the cost of litigation. Id. (citing Bradford, 238 F.3d at 556). She, therefore, has failed to meet the substantial burden of invalidating the arbitration clause on this ground. Compare Green Tree, 531 U.S. at 90–91 (holding that the risk that arbitration costs would be prohibitive was "too speculative to justify the invalidation of an arbitration agreement" where the record contained "hardly any information on the matter"), with Reed v. LTN Glob. Commc'ns, Inc., No. JRR-24-3649, 2025 WL 2653196, at *9 (D.Md. Sept. 16, 2025) (finding arbitration costs would be prohibitive where plaintiff submitted declaration as to his income and ordinary expenses, professional arbitrator's opinion on the amount of time arbitration would take, and an estimated hourly rate for an arbitrator).

      c.        **Attorneys' Fees**

An arbitration agreement also may be unenforceable if it is "inconsistent with any substantive rights afforded by the statute" under which the plaintiff brings their claims, such as when the arbitration clause precludes the plaintiff from obtaining relief that they would otherwise be entitled to under the statute. In re Cotton Yarn Antitrust Litig., 505 F.3d at 288–89 (citing cases in which courts held arbitration clauses unenforceable when they precluded plaintiff from collecting damages that plaintiff could recover under relevant statutes); see also Reed, 2025 WL 2653196, at *10 (finding a provision in arbitration clause that required parties to pay own costs and attorneys' fees unenforceable because federal statute under which plaintiff brought their claims allows for recovery of attorneys' fees (citations omitted)). Here, the arbitration clause does not limit Parker's ability to recover damages or obtain injunctive relief, (see generally HPA at 10–11), but it does require each party to "bear its own attorney's fees and expenses" incurred during arbitration, (id. at 10). This language is unenforceable because it precludes Parker from collecting attorneys' fees if she prevails in arbitration, a form of relief that she would otherwise be entitled to under the FHA and CRA. See 42 U.S.C. § 3613(c)(2) (FHA provision allowing a prevailing party to recover attorneys' fees and costs); 42 U.S.C. § 1988(b) (CRA provision allowing a prevailing party to recover attorneys' fees and costs).

Having found the attorneys' fees language unenforceable, the Court must "consider whether severance of the [unenforceable] provision[], rather than invalidation of the arbitration agreement[], would be the appropriate remedy." In re Cotton Yarn Antitrust Litig., 505 F.3d at 292. An unenforceable provision is severable if the contract contains a

severability clause and the unenforceable provision does not "go to the essence of the contract . . . ." Beckley Oncology Assocs., Inc. v. Abumasmah, 993 F.3d 261, 266 (4th Cir. 2021). Here, the HPA contains a severability clause, (see HPA at 11–12), and there is no evidence or indication that the attorneys' fees language "go[es] to the essence of" the HPA, Abumasmah, 993, F.3d at 266; see, e.g., Reed, 2025 WL 2653196, at *10 (severing unenforceable cost-splitting and attorneys' fees provisions); Barach v. Sinclair Media III, Inc., 392 F.Supp.3d 645, 655 (S.D.W.Va. 2019) (severing unenforceable fee-shifting provision). The Court, therefore, will sever the language found in sections 12.6(c) and 12.7 of the arbitration clause that requires each party to bear its own attorneys' fees in arbitration, (HPA at 10–11),[5] and find the remainder of the arbitration clause enforceable.

### 2. Scope of Arbitration Clause

Parker also challenges the scope of the arbitration clause. (See Opp'n Pulte Mot. at 5–10). She argues that the relevant facts in this case are unrelated to the HPA, that arbitration is not an appropriate method for addressing her claims, and that she did not intend to agree to arbitrate her discrimination claims. (Id.). Pulte and Pooler argue that the scope of the arbitration clause is a matter for the arbitrator to decide and that, in any event, Parker's claims fall under the arbitration clause. (Pulte Reply at 3–7; Pooler Reply at 3). The Court finds that the scope of the arbitration clause extends to all Parker's claims.

---

[5] The severed language from section 12.6(c) is, "Each party shall bear its own attorney's fees and expenses (including without limitation the costs and fees of any expert witnesses) in the arbitration, any confirmation proceeding and any appeal." (HPA at 10). The severed language from section 12.7 is, "Except as stated above, each party shall bear its own attorney's fees and other expenses incurred in connection with a Dispute." (Id. at 11).

The question of whether a dispute is arbitrable involves a two-step inquiry: (1) should the court or the arbitrator decide arbitrability; and (2) if the court should decide, is the dispute arbitrable? Peabody Holding Co., LLC v. United Mine Workers of Am., Intern. Union, 665 F.3d 96, 101 (4th Cir. 2012). As to the first prong, "the question of arbitrability . . . is undeniably an issue for judicial determination." Id. at 102 (quoting AT & T Techs., Inc. v. Comm'cns Workers of Am., 475 U.S. 643, 649 (1986)). Parties "can agree to arbitrate arbitrability, but such an agreement must clearly and unmistakably provide that the arbitrator shall determine what disputes the parties agreed to arbitrate." Id. (citation modified). The federal policy favoring arbitration does not apply to this question of arbitrability. Id. (citations omitted).

The Court of Appeals for the Fourth Circuit has determined that when two sophisticated parties incorporate into their contract a particular set of rules that "delegate questions of arbitrability to an arbitrator," such as the AAA Rules, "then that incorporation constitutes the parties' clear and unmistakable intent to let an arbitrator determine the scope of arbitrability." Stone v. Wells Fargo Bank, N.A., 361 F.Supp.3d 539, 553 (D.Md. 2019) (quoting Simply Wireless, Inc. v. T-Mobile US, Inc., 877 F.3d 522, 529 (4th Cir. 2017)). The Fourth Circuit has not, however, extended this conclusion to cases in which one party is "unsophisticated," such as an employee in a suit against an employer-company. See id. at 553–55 (citations omitted). Moreover, this Court remains unpersuaded that "a single cross-reference to the AAA Rules provides 'clear and unmistakable' evidence of [an

unsophisticated] plaintiff's intent to arbitrate arbitrability." Id. at 555.[6] "It strains credulity to believe that [Parker]," a first-time homebuyer, (Compl. ¶ 14), "knew—much less intended—that the cross-reference [to the AAA Rules in the HPA] directed an arbitrator to decide arbitrability," Stone, 361 F.Supp.3d at 555. This Court, therefore, will determine whether Parker's claims are arbitrable.

In determining arbitrability, courts must apply both "ordinary state law principles governing the formation of contracts, . . . [and] the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA." Muriithi, 712 F.3d at 179 (quoting Hill, 412 F.3d at 543). In doing so, "due regard must be given to the federal policy favoring arbitration," and any ambiguities or uncertainties regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration. Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475–76 (1989) (citation omitted); see also Muriithi, 712 F.3d at 179 (citing Moses, 460 U.S. at 24–25).

---

[6] Since Stone, this Court has found incorporation of standard arbitration rules to be clear and unmistakable evidence of an unsophisticated plaintiff's intent to arbitrate, but additional facts that are not present here guided those conclusions. See, e.g., Malamatis v. ATI Holdings, LLC, No. ELH-21-2226, 2022 WL 1591406, at *25 (D.Md. May 19, 2022) (finding incorporation of AAA Rules was clear and unmistakable evidence where it was "not immediately apparent whether [plaintiff] qualifie[d] as a sophisticated or unsophisticated party," but plaintiff was "a self-described 'seasoned veteran of medical sales,'" the type of work he performed for defendant-employer); Gordon v. Zeroed-In Tech., LLC, No. BAH-23-3284, 2025 WL 941365, at *23 (D.Md. Mar. 26, 2025) (finding incorporation of JAMS Rules (arbitration rules for employment contracts) was clear and unmistakable evidence where, alongside the arbitration agreement, the unsophisticated employee-plaintiff received a "Frequently Asked Questions" document that provided information on JAMS Rules and how to access them).

When determining arbitrability, "[c]ourts have distinguished between 'narrow' and 'broad' arbitration clauses." <u>Stone</u>, 361 F.Supp.3d at 556. Narrow arbitration clauses "require 'only the arbitration of claims arising under the contract,'" whereas "broad arbitration clauses 'embrace every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute.'" <u>Id.</u> (quoting <u>Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.</u>, 96 F.3d 88, 93 (4th Cir. 1996)). "Broad provisions do not limit arbitration to the literal interpretation or performance of the contract. Therefore, the governing standard for determining the arbitrability of plaintiff's claim" when faced with a broad arbitration provision "is whether plaintiff's claims have a significant relationship to the Agreement." <u>Id.</u> (citation modified).

Here, the HPA contains a broad arbitration clause that covers "<u>any</u> controversy, claim or dispute that arises out of or is related to [the HPA] or the [townhome Parker purchased] . . . whether arising before or after Closing." (HPA at 10 (emphasis added)). Applying the "governing standard," the Court finds that Parker's claims "have a significant relationship to" the HPA. <u>Stone</u>, 361 F.Supp.3d at 556 (quoting <u>Long v. Silver</u>, 248 F.3d 309, 317 (4th Cir. 2001)).

First, Parker's allegations regarding "deceptive trade practices," "intentional misrepresentation," and "fraud," (Counts I–III), (Compl. ¶¶ 37–79), all stem from communications that are related to matters covered in the HPA. Specifically, discussions regarding what size townhome Parker intended to purchase, the down payment, the incentive for using Pulte Mortgage's services, and Parker's VA loan eligibility, all of which underly Counts I–III, (<u>see</u> <u>id.</u> ¶¶ 40, 57–62, 66–70), relate to the HPA, (<u>see</u> HPA at 3

(describing the property Parker agreed to purchase and the down payment); id. at 16 (Parker's agreement to obtain loan through Pulte Mortgage); id. at 18 (addendum regarding Parker's veteran status and VA loan selection)). The fact that these communications occurred before Parker took possession of the townhome does not remove them from the scope of the arbitration clause, as Parker suggests, (Opp'n Pulte Mot. at 6), because the clause extends to disputes that arise "before or after Closing," (HPA at 10).

Next, Parker's federal discrimination claims (Counts IV–V), (Compl. ¶¶ 80–96), also arise out of the HPA because they are based on the inflated down payment that Pulte demanded and the allegedly higher price that Parker paid for her home compared to her white neighbors, (see id. ¶¶ 84, 91). Both the purchase price and down payment are covered in the HPA and relate to Parker's purchase of the townhome. (See HPA at 3 (discussing price and down payment)). Parker argues that she did not intend to agree to arbitrate federal discrimination claims when she signed the HPA. (Opp'n Pulte Mot. at 8). But the unambiguous language of the HPA's broad arbitration clause, which covers "any controversy, claim or dispute that arises out of or is related to [the HPA] or [the townhome Parker purchased]," (HPA at 10 (emphasis added)), will not give way to what Parker says she intended, see Dumbarton, 73 A.3d at 232. Additionally, reading the arbitration clause as covering Parker's discrimination claims aligns with the "federal policy favoring arbitration." Stone, 361 F.Supp.3d at 556 (quoting Moses, 460 U.S. at 24).

Finally, Parker's intentional infliction of emotional distress claim (Count VI), (Compl. ¶¶ 97–104), falls within the scope of the arbitration clause because it is based on the same actions that underly the deceptive practices, intentional misrepresentation, fraud,

and discrimination claims, (see id.), all of which relate to the HPA. Accordingly, the Court finds the arbitration clause applicable to all Parker's claims.

### 3.    Costs and Attorneys' Fees

Pulte and Pooler both contend that, under the arbitration clause, they are entitled to recover costs and reasonable attorneys' fees incurred in connection with the instant Motions to Compel Arbitration. (See Pulte Mot. at 11; Pooler Mot. at 5). The relevant provision of the arbitration clause provides:

> **12.7  Expenses.** . . . [I]f a party to this Agreement files a court action in violation of this Section 12 and the other party is required to compel arbitration by filing a motion with the court, the court shall award the moving party its court costs and reasonable attorneys' fees incurred in connection with the motion.

(HPA at 11). Parker does not appear to dispute the existence or the enforceability of this provision. (See generally Opp'n Pulte Mot.). Courts within this circuit have repeatedly upheld similar fee-shifting provisions, see e.g., Lillard v. Tech USA, Inc., No. ADC-20-308, 2020 WL 4925661, at *5 (D.Md. Aug. 21, 2020); Bracey v. Lancaster Foods, LLC, No. RDB-17-1826, 2018 WL 1570239, at *8 (D.Md. Mar. 30, 2018), aff'd, 838 F.App'x 745 (4th Cir. 2020); Robinson v. Taboo Gentlemen's Club, LLC, No. 3:14-CV-123, 2015 WL 3868531, at *11 (N.D.W.V. June 23, 2015), and this Court reaches the same conclusion here. Pulte and Pooler, therefore, may file motions to recover costs and attorneys' fees incurred in this litigation.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Pulte's Motion to Stay and Compel Arbitration (ECF No. 10). The Court will grant in part Pooler's Motion to Dismiss or, in the Alternative, Stay and Compel Arbitration (ECF No. 11) as to Pooler's request to stay this case and compel arbitration and deny as moot, without prejudice, Pooler's request to dismiss this case. Additionally, the Court will direct Pulte and Pooler to submit their requests for costs and attorneys' fees incurred in this litigation, and any necessary documentation, within fourteen days of the date of this Memorandum Opinion and the accompanying Order. This case will be stayed pending resolution of Parker's claims in arbitration. A separate Order follows.

Entered this 20th day of November, 2025.

_____/s/_____
George L. Russell, III
Chief United States District Judge